IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

ROGER SCHLOSSBERG,

    Plaintiff,

v.

B.F. SAUL INSURANCE AGENCY
OF MD., INC., et al.,

    Defendants.

\*    \*    \*    \*

Case No.: GJH-13-3076

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## MEMORANDUM OPINION

The question presented by this case is whether an insurance broker may be deemed negligent when an insured's policy excludes coverage that the insured never requested but later needed. In this professional negligence action, Plaintiff, Roger Schlossberg, Chapter 7 Trustee of DTM Corporation ("DTM"), alleges that Defendants B.F. Saul Insurance Agency of MD, Inc. ("B.F. Saul") and David Schwarz (collectively, "Defendants"), failed to secure adequate insurance coverage for DTM's activities and failed to explain a change in coverage in a renewal policy. This Memorandum Opinion and accompanying Order address Defendants' Motion for Summary Judgment. ECF No. 67. The Court has fully considered the Parties' submissions and deems a hearing unnecessary. *See* Loc. R. 105.6 (D. Md.). For the reasons stated herein, Defendants' Motion is **GRANTED**, and Plaintiff's Complaint is dismissed with prejudice.[1]

---

[1] Because the Court is granting summary judgment for the Defendants, the Court will deny Defendants' Appeal of Magistrate Judge Decision, ECF No. 71, as moot.

## I.   BACKGROUND

Prior to filing for bankruptcy, DTM provided security guards and related services to its

clients, the vast majority of which were governmental entities, including the United States

Department of Defense ("DOD").[2] *See* ECF No. 3 at ¶ 7; ECF No. 67 at 46–49, 50–53.[3] B.F.

Saul assisted DTM in obtaining a complete line of insurance coverage for its business, and Mr.

Schwartz, B.F. Saul's Assistant Vice President, was the individual principally responsible for

communicating with DTM. *See* ECF No. 72-6 at 3–4. B.F. Saul, at DTM's request, procured a

Commercial General Liability Policy ("GL Policy") from Arch Insurance Company ("Arch")

beginning in 2003 with a policy limit of $1 million for "each occurrence" and an aggregate limit

of $5 million. *See* ECF No. 67 at 46–53, 136. Beginning in 2005, DTM began purchasing an

Umbrella Policy from Arch Specialty Insurance Company ("Arch Specialty"). *See* ECF No. 72-

7. Every year, in order to obtain these policies, DTM was required to complete relevant policy

applications. Jeanette Moody, DTM's comptroller, filled out the relevant insurance applications

for DTM and received input from different departments at DTM, such as accounting and

operations, to enable her to complete the application with the relevant payroll and operational

information. ECF No. 67 at 57–58, 78. In particular, Ms. Moody would generally discuss the

insurance applications with DTM's Chief Operating Officer ("COO"), Margo Briggs,

specifically concerning the risks associated with the tasks performed by DTM employees. *Id.* at

84, 86–92.

---

[2] Although Plaintiff objects to Defendants' reliance on unsupported background facts, *see* ECF No. 72 at 1 n.1, in resolution of this Motion, the Court relies only on facts for which there is evidentiary support and views such facts in the light most favorable to Plaintiff.

[3] All pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Every year, the GL Policy application included a question that required DTM to itemize its annual payroll into subcategories in accordance with the services performed by DTM's security guards. *Id.* at 48, 107–111.[4] One subcategory was labeled "Burglar/Fire Alarms" and included a notation stating: "separate alarm application must be completed if this coverage is desired." *See id.* On DTM's 2003 GL Policy application, that portion of the application was filled in with the notation "N/A." *Id.* at 48. In each year subsequent to the 2003 GL policy application, the "Burglar/Fire Alarms" portion of the application was left blank. *Id.* at 107–111; *see also* ECF No. 72-16 at 10.

Because DTM did not provide any information indicating that it needed insurance coverage for any activity involving alarm systems, each policy which Defendants obtained on behalf of DTM contained an alarm exclusion. The alarm exclusion in the GL Policy from 2004 through 2008 read: "This insurance does not apply to liability arising out of, or caused or contributed to by the sale, leasing, rental, installation, maintenance or service of any alarm, alarm device, alarm component or alarm system." *See* ECF No. 67 at 112, 162. DTM's first Umbrella Policy, obtained in 2005, similarly included an alarm exclusion which excluded coverage for liability "arising out of or caused or contributed to by the ownership, maintenance, operation, use or installation of any alarm, alarm device, alarm component or alarm system." *Id.* at 113.

When DTM sought a renewal of its prior policies in 2007, however, the new Umbrella Policy, effective from August 8, 2007 through August 8, 2008, was issued by Arch, rather than Arch Specialty, and it contained a differently worded alarm exclusion. *See* ECF No. 72-12 at 7. That exclusion provided that coverage did not apply to "[a]ny 'bodily injury' or 'property

---

[4] Plaintiff objects, pursuant to Fed. R. Civ. P. 56(c)(2), to these and other exhibits attached to Defendants' Motion on the ground that Defendants failed to authenticate them. *See* ECF No. 73 at 1. The Court overrules these objections because Plaintiff has failed to show that any of the exhibits "*cannot* be presented in a form that would be admissible in evidence." Rule 56(c)(2) (emphasis added). Indeed, in their reply, Defendants cite to the relevant deposition transcripts wherein witnesses authenticated the relevant documents. ECF No. 76 at 15 n.7.

damage' arising out of or caused or contributed to by the ownership, maintenance, operation, *monitoring*, use or installation of any alarm, alarm device, alarm component or alarm system." ECF No. 67 at 114 (emphasis added).

Through B.F. Saul, DTM sought and obtained renewal of the 2007-2008 policies, and DTM's 2008-2009 Umbrella Policy contained the same alarm exclusion barring claims related to alarm monitoring. Mr. Schwartz sent a letter to Ms. Moody on September 19, 2008, when the renewal policy was procured, in which he enclosed the 2008-2009 GL and Umbrella Policies. *See id.* at 115. In relevant part, the letter stated: "With regard to the General/Professional Liability policy, among the exclusions are included [sic] work with Canines and Alarm Systems. If this is a concern, please let us know immediately." *Id.* Ms. Moody, upon receipt of the letter, had no concerns as to the scope of coverage. In her deposition, she testified: "I wouldn't know why [Mr. Schwartz] would say that. I mean, I know we don't have – we didn't know why that would be in the letter, canines and alarm systems." *Id.* at 80. She further stated that she did not recall anyone at DTM ever mentioning that they did any sort of work with alarms.[5] *Id.* at 81. Similarly, Ms. Briggs, when asked whether she recalled the cover letter that accompanied the 2008-2009 policies, responded as follows:

---

[5] Although Plaintiff objects to Defendants' reliance on this testimony from Ms. Moody, *see* ECF No. 72-16 at 11– 12, the objections are without merit. Plaintiff first argues that Ms. Moody's reaction to Mr. Schwartz's letter is irrelevant because the letter did not mention the Umbrella Policy, but only referred to the alarm exclusion in the GL policy. But there is nothing in the record suggesting that Ms. Moody, or anyone at DTM, would have reacted differently if the Umbrella Policy or its specific alarm exclusion was mentioned. Indeed, both Ms. Moody and Ms. Briggs were adamant that they had no knowledge that DTM guards were responsible for monitoring alarms. *See* ECF No. 67 at 80–81, 96–98, 104. Plaintiff further disputes the materiality of Ms. Moody's testimony regarding her reaction to Mr. Schwartz's letter because Ms. Moody testified, "I know *we* don't have – *we* didn't know why that would be in the letter . . ." which, according to Plaintiff, demonstrates that Ms. Moody was concerned enough about the alarm exclusion to discuss it with other DTM employees. Even so, Ms. Moody's testimony is material to the dispute in this case because it demonstrates that, even if Ms. Moody was sufficiently concerned about the alarm exclusion to discuss it with other individuals at DTM, DTM nevertheless ultimately concluded that it did not require any form of alarm coverage. *See* ECF No. 67 at 100–101, 104.

4

[Ms. Briggs:] I just remember some discussion that we didn't do canines and we didn't do alarm systems. That's all I remember that year, was a question to me for operation. And we didn't.

Q: So there was no concern at DTM about an exclusion for alarm systems?

[Ms. Briggs:] No.

Q: Did that include monitoring systems?

[Ms. Briggs:] That include [sic] monitoring, too. We wasn't monitoring.

*Id.* at 104.[6]

DTM's lack of alarm monitoring coverage only became a concern when, on January 5, 2009, an incident occurred at DOD's Fort Washington Facility at which DTM guards were employed. DTM guards were responsible for monitoring the facility's alarm system, but failed to follow proper procedures when a heat sensor alarm was activated. *See id.* at 117. DOD later asserted a claim against DTM, alleging that the DTM guards' failure to properly respond to the heat sensor alarm caused $3.6 million in damage to specialized computer equipment at the facility. *See id.* at 119; ECF No. 3 at ¶ 21; ECF No. 22 at ¶ 21. Previously, when DTM entered the contract with DOD to provide guard services at the Fort Washington Facility, the guards were provided "post orders" which indicated that DTM guards were required to, among other things, "[m]onitor[] the [Fort Washington facility] Alarm System in accordance with established procedures, to include, alarm response, notifications, and logging/documenting any/all alarms, trouble, and/or maintenance issues." *See* ECF No. 67 at 129. The post orders were never

---

[6] Plaintiff objects to Defendants' reliance on Ms. Briggs' testimony on the ground that Defendants impute her statements to DTM without evidence that Ms. Briggs was testifying on behalf of DTM or in her capacity as a duly authorized representative. ECF No. 72-16 at 16. This objection is overruled. Ms. Briggs, DTM's COO, had personal knowledge of DTM's activities. Additionally, this statement is relevant to the issue at hand; indeed, if DTM's COO did not know that DTM was monitoring alarm systems, it cannot seriously be claimed that DTM's insurance broker should have known that DTM was conducting such activity. To the extent that Plaintiff's objection relates to a hearsay issue, the Court also overrules that objection because Ms. Briggs' statement that DTM "wasn't monitoring" clearly is not offered for the truth of the matter asserted because the statement is, in fact, untrue—DTM guards *were* monitoring alarms at Fort Washington. The statement is also relevant to Ms. Briggs' state of mind at the time that DTM had to respond to Mr. Schwartz's letter in which he inquired whether it was a problem that the GL Policy contained an alarm exclusion.

provided to Mr. Schwartz or any other B.F. Saul employee, and Ms. Moody was unaware of them. *See id.* at 71–72.

DTM requested coverage for the incident at Fort Washington under its 2008-2009 GL and Umbrella Policies. *Id.* at 116. Arch accepted coverage under the GL Policy, but denied coverage under the Umbrella Policy based on the alarm exclusion under that policy, specifically, its language limiting liability for damages related to alarm "monitoring." *Id.* at 122–23, 126–27. Arch, pursuant to the coverage under the GL Policy, provided a defense to DTM for DOD's claims, and DTM subsequently requested and received alarm monitoring coverage with a corresponding increase in its insurance premium. *Id.* at 132–34, 245–48.

Because of the incident, DOD threatened to withhold payments under its contract with DTM to satisfy its damages. *See* ECF No. 72-4 at 11; ECF No. 72-15 at 2. It is unclear, however, whether DOD ever did, in fact, withhold any payments or, if it did, if such withholding was because of the Fort Washington claim or for other reasons.[7] Moreover, Ms. Briggs stated that, although DOD was "getting ready" to withhold a certain amount of money under its contract with DTM in settlement of the Fort Washington claim, DOD did not actually do so. ECF No. 72-4 at 11. Ms. Briggs further explained that DOD was frequently late in making payments, that DTM had to obtain a payment plan through the "Small Business" office, that DOD did ultimately pay, but that "at the end [DOD] didn't pay" and Ms. Briggs did not know "where the money went." *Id.* at 13. Fernal Briggs, DTM's Vice President, *see* ECF No. 72-4 at 16; ECF No. 72-15, testified similarly. He stated that DOD did eventually fail to pay DTM, but then, in response to the question of whether DOD ever refused to pay DTM in connection with the Fort Washington

---

[7] In addition to the dispute regarding the Fort Washington incident, DTM also suffered other payment penalties pursuant to its contract with DOD in the form of equitable adjustments and liquidated damages. ECF No. 72-4 at 12.

incident, Mr. Briggs stated, "I think they insinuated they had the capacity to withhold money," but he did not know whether they ever did so. ECF No. 72-3 at 8.

In addition to the financial difficulties caused by DTM's volatile relationship with DOD, DTM was in a precarious financial situation due to an outstanding debt owed to the United States Internal Revenue Service. *See* ECF No. 72-4 at 11–12, 14. As a result of its financial challenges, while DOD's claim was still pending against it, DTM filed for protection under Chapter 7 of the United States Bankruptcy Code. *See* ECF No. 72-3 at 7. Plaintiff contends that, as a result of the Fort Washington incident and DOD's threats to withhold payments, DTM did not have enough revenue to pay its employees or outstanding tax obligations, and, accordingly, "did not have the financial wherewithal to qualify for Chapter 11 protection [under the United States Bankruptcy Code], and its only available course of action was to file for protection under Chapter 7 . . . thereby liquidating its estate." ECF No. 72 at 19. On January 16, 2014, Plaintiff, acting in his capacity as Trustee of DTM, Arch, and DOD entered into a settlement agreement whereby DOD agreed to release its claim arising from the Fort Washington incident in exchange for $500,000 to be paid to DOD by Arch. ECF No. 67 at 246.

On November 15, 2013, Plaintiff commenced the present action alleging one count of professional negligence against Defendants. ECF No. 3 at ¶¶ 33–45. In particular, Plaintiff alleges that Defendants were negligent in failing to warn DTM of the differences between the GL policy and the Umbrella Policy as it related to the alarm exclusion, and that, as a result of Defendants' negligence, DTM was unable to resolve DOD's claim against it, forcing DTM to cease operations through Chapter 7 bankruptcy. *Id.* at ¶¶ 40–41, 43–44. Defendants now move for summary judgment, arguing that they owed no duty to provide DTM with a policy that covered alarm monitoring and that Plaintiff cannot prove that any breach of a duty caused DTM

any loss. *See* ECF No. 67. Plaintiff opposes the motion. *See* ECF No. 72. For the reasons stated below, the Court will grant Defendants' Motion.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.    DISCUSSION

It is well-established that, to recover in an action for negligence under Maryland law, a plaintiff must prove: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and

8

(4) that the loss or injury proximately resulted from the defendant's breach of the duty." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 10 (Md. 2013) (quoting *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 270–71 (Md. 2007)) (emphasis omitted). Here, Defendants launch a two-pronged attack on Plaintiff's negligence claim. First, Defendants argue that they owed no duty to provide DTM with a policy that covered alarm monitoring or to explain the import of the addition of the word "monitoring" to the 2007-2008 Umbrella Policy alarm exclusion. *See* ECF No. 67 at 6; ECF No. 76 at 2–3. Second, Defendants argue that Plaintiff cannot establish the element of causation. *See* ECF No. 67 at 6. The Court will address each argument in turn.

### A. Defendants' Duty to Provide DTM with Alarm Monitoring Coverage and Duty to Identify and Explain Differences in a Renewal Policy

The Parties vigorously dispute the scope of an insurance broker's duty to procure coverage for an insured where the insured does not request such coverage, as well as the scope of a broker's duty to explain any changes in a renewal policy. Defendants argue that they had no duty to procure coverage for alarm monitoring where DTM never requested such coverage, nor alerted Mr. Schwartz or anyone else at B.F. Saul that DTM guards monitored alarms. ECF No. 67 at 16–21. Plaintiff, however, contends that, because the terms of the Umbrella Policy's alarm exclusion changed, Defendants had an obligation to alert DTM of this change, notwithstanding DTM's failure to ever request coverage for alarm monitoring. ECF No. 72 at 10–13.

An insurance broker—the independent middleman between an insured and insurer—generally owes a duty to exercise reasonable care and skill in performing his duties. *See Green v. H & R Block, Inc.*, 735 A.2d 1039, 1054 (Md. 1999) (citation omitted); *Sadler v. Loomis Co.*, 776 A.2d 25, 37 (Md. Ct. Spec. App. 2001). Because the relationship between a broker and insured is ordinarily that between principal and agent, *see Green*, 735 A.2d at 1054, a broker "may become liable to those including his principal, who are caused a loss by his failure to use

9

standard care." *Ins. Co. of N. Am. v. Miller*, 765 A.2d 587, 600 (Md. 2001) (citation omitted).

Under Maryland law, an insurance broker may be found negligent when he "is employed to

obtain a policy that covers certain risks and . . . fails (1) to obtain a policy that covers those risks,

and (2) to inform the employer that the policy does not cover the risks sought to be covered . . .

." *Int'l Bhd. of Teamsters v. Willis Corroon Corp. of Md.*, 802 A.2d 1050, 1057 (Md. 2002).

In *Popham v. State Farm Mutual Insurance Co.*, 634 A.2d 28 (Md. 1993), the Court of

Appeals of Maryland considered whether an insurer can be liable in negligence for failure to

advise an insured in writing as to the existence of a certain type of policy coverage—in that case,

uninsured motorist coverage in an umbrella policy. The plaintiffs in that case, Christine Popham

and her father, obtained insurance coverage from the defendant, State Farm Mutual Insurance

Co., Inc. ("State Farm"). Their automobile insurance policy included uninsured motorist

coverage with coverage limits of $100,000 per person and $300,000 per occurrence. The

plaintiffs also had an "excess," or umbrella policy, which contained coverage of $1 million, but

did not include any uninsured motorist coverage. *Id.* at 29. When Ms. Popham was injured in a

motor vehicle accident in which the driver of the other vehicle had only minimal liability

coverage, the plaintiffs brought an action against State Farm and its insurance agent, alleging that

the defendants were negligent in failing to advise them of the availability of uninsured motorist

coverage under the umbrella policy. *Id.* The Court of Appeals framed the question as one of what

duty may have been owed by State Farm and its insurance agent, specifically, whether the

defendants owed a duty "to offer an insured an opportunity to obtain additional uninsured

motorist coverage in the same amount as the liability coverage provided." *Id.* at 36–37. The

Court of Appeals concluded that such a duty may exist and that the trial court had improperly

dismissed the plaintiffs' claims. A trier of fact, the court found, may have reasonably concluded

that State Farm, through its agent, failed to exercise reasonable care when it failed to advise the
plaintiffs that they may purchase uninsured motorist coverage equal to the liability coverage
under the umbrella policy. *Id.* at 38.

The Court of Special Appeals of Maryland later distinguished *Popham* in *Sadler v.
Loomis Co.*, 776 A.2d at 39, and concluded that an insurance broker does *not* have a duty to
advise an insured as to the *amount* of coverage that may be appropriate in a given circumstance.
In that case, also involving an automobile accident, an injured motorcyclist sued the driver of the
other vehicle in the accident, seeking $10 million. The defendant's insurance policy had a
maximum coverage of only $100,000, and, after settling with the plaintiff for $1 million, the
defendant brought suit against her broker alleging that it acted negligently in failing to provide
her with "periodic quotes as to the cost of additional protection, or sufficient information to
enable her to make an informed decision as to an appropriate level of liability coverage." *Id.* at
27. The court noted that it did not uncover "any Maryland case that has imposed on an insurance
agent or broker the affirmative duty to make an unsolicited recommendation concerning
appropriate coverage, absent a special relationship or a request from the insured to provide such
information," and, accordingly, the court affirmed the trial court's grant of summary judgment in
favor of the broker. *Id.* at 39–40, 46–47; *accord Suter v. Virgil R. Lee & Son, Inc.*, 754 P.2d 155,
157 (Wash. Ct. App. 1988) ("[I]t is the insured's responsibility to advise the agent of the
insurance that he wants, including the limits of the policy to be issued."); *Murphy v. Kuhn*, 682
N.E.2d 972, 976 (N.Y. 1997) ("Insurance agents or brokers are not personal financial counselors
and risk managers, approaching guarantor status. Insureds are in a better position to know their
personal assets and abilities to protect themselves more so than general insurance agents or
brokers, unless the latter are informed and asked to advise and act." (citation omitted)).

11

Finally, in *Saylab v. Don Juan Restaurant, Inc.*, 332 F. Supp. 2d 134 (D.D.C. 2004), the United States District Court for the District of Columbia considered the import of the two preceding opinions in a case wherein the patron of a Don Juan Restaurant was involved in an automobile accident after consuming alcohol in the restaurant. Don Juan's insurer denied coverage for the incident, relying on a policy exclusion for injuries resulting from serving alcohol, and Don Juan then brought an action against its insurance broker alleging that the broker failed to notify the restaurant owner about the existence of liquor liability coverage. *Id.* at 144. The court, noting that Don Juan asserted that the broker "failed to advise the restaurant about a form, as oppose d to an amount, of coverage—i.e., liquor liability insurance," *id.* at 146, concluded that the case was controlled by *Popham*, rather than *Sadler*. It therefore concluded that "the question of whether [Don Juan's broker] was negligent by not informing Don Juan about liquor liability coverage is best resolved by having the trier of fact determine whether [the broker] met the applicable standard of care for insurance agencies in the District of Columbia." *Id.*

The question presented in this case, involving the availability of alarm monitoring coverage, at first blush appears to fall within the purview of *Popham* and *Saylab*, rather than *Sadler*. Plaintiff does not allege that Defendants failed to advise DTM as to a particular *amount* of coverage, but rather than it failed to procure a particular *type* of coverage, i.e., coverage for damage caused by or related to monitoring alarm systems. But this case is fundamentally different from *Popham* and *Saylab*—and even *Sadler*—because Defendants *did* advise DTM of the opportunity to obtain alarm coverage. The insurance applications which DTM completed each year explicitly stated that "[s]eparate alarm application must be completed if this coverage

is desired,"[8] *see* ECF No. 67 at 48, 107–111, and Mr. Schwartz specifically inquired as to whether the exclusion of alarm coverage was a concern to DTM, *id.* at 115. DTM was in a far superior position than Defendants to determine its own insurance needs and, because DTM continuously failed to request any coverage related to alarm systems, Defendants had no way of knowing that any such coverage may be necessary. *See Sadler*, 776 A.2d at 40 ("Absent full disclosure by an insured, which an agent or broker cannot compel, an agent or broker would have no way to ascertain an insured's exposure. Nor would the agent or broker necessarily know of a change in the insured's circumstances or economic status, which could affect the suitability of existing coverage."). Defendants therefore did not breach any duty in failing to procure coverage for alarm monitoring.

Plaintiff argues, however, that Defendants' duty arose when DTM's Umbrella Policy was renewed in 2007 and the alarm exclusion *changed* from one which did not specifically exclude alarm monitoring to one that did. *See* ECF No. 72 at 10–11. Under Maryland law, an insured is permitted to assume that when a policy is renewed, it contains the same terms as a previous policy unless the insurer provides proper notice of any modifications. *See Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1236 (4th Cir. 1996) ("An insured is entitled to assume that a renewal of his insurance contract will contain the same coverage as the prior contract unless the insurer has sent proper notice of any modifications."); *Gov't Emps. Ins. Co. v. Ropka*, 536 A.2d 1214, 1222–23 (Md. Ct. Spec. App. 1988) ("It has been held universally, by the jurisdictions that

---

[8] In response to Defendants' Statement of Material Facts as to Which There is No Genuine Dispute, ECF No. 67 at 39–44, Plaintiff argues that the indication on the GL Policy application that "[s]eparate alarm application must be completed if this coverage is desired" is irrelevant to the ultimate issue in this case because the application for the relevant Umbrella Policy did not provide DTM with an opportunity to request alarm-related coverage. ECF No. 72-16 at 2. The argument is unpersuasive. As the Court indicated previously, *see* footnote 4 of this Memorandum Opinion, there is nothing in the record to support the suggestion that DTM would have taken any different action if the alarm exclusion was specifically referenced in relation to DTM's application for Umbrella Policies, as opposed to the GL Policies. To the contrary, Plaintiff's suggestion that DTM may have acted differently is not credible considering both Ms. Moody and Ms. Briggs were adamant that they had no knowledge that DTM guards were responsible for monitoring alarms. *See* ECF No. 67 at 80–81, 96–98, 104.

have reached the issue, that where an insurer agrees to renew a policy, the insured should have a right to expect that the new protection will be in substance the same as that afforded by the former contract and upon the same conditions."). Thus, Plaintiff contends that even though DTM never requested alarm coverage, it was allowed to assume that the Umbrella Policy's alarm exclusion did not exclude coverage for alarm monitoring because, prior to 2007, it in fact did not exclude such coverage. ECF No. 72 at 11–12. In support of this argument, Plaintiff cites to the deposition testimony of an expert who opined that, by failing to identify and explain the effect of the new alarm exclusion to DTM, Defendants breached their professional duty. *Id.* at 12; *see also* ECF No. 72-11 at 3–8.

The cases on which Plaintiff relies in support of this argument, however, explain only that the duty to provide notice of a change in policy is imposed on an *insurer*, not an insurance broker. *See Benner*, 93 F.3d at 1231; *World Ins. Co. v. Perry*, 124 A.2d 259, 260 (Md. 1956); *J.A.M. Assocs. of Balt. v. W. World Ins. Co.*, 622 A.2d 818, 822 (Md. Ct. Spec. App. 1993); *Ropka*, 536 A.2d at 1222–23. But even assuming that an insurance broker has a similar duty to provide notice of changes to a policy, that duty only arises upon a *significant* change in the policy. As the Maryland Court of Special Appeals indicated, "[a]n insurance agent in renewing a policy is not required to point out to the insured every formal change and linguistic revision." *J.A.M. Assocs. of Balt.*, 622 A.2d at 822 (internal quotation marks and citation omitted). Rather, "the law requires that reasonable notice be given to the insured if the insurer intends to make a *significant* change in the new policy." *Id.* (emphasis added); *see also Ben Lewis Plumbing, Heating & Air Conditioning, Inc. v. Liberty Mut. Ins. Co.*, 731 A.2d 904, 915 (Md. 1999); *Benner*, 93 F.3d at 1236; *Nationwide Mut. Fire Ins. Co. v. Mekliesky*, 976 F. Supp. 351, 353–54 (D. Md. 1997), *aff'd*, 161 F.3d 3 (4th Cir. 1998). Before the incident at DOD's Fort Washington

facility, Defendants had no way of knowing that the addition of the word "monitoring" to the Umbrella Policy's alarm exclusion would be a *significant* change to DTM's policy. Indeed, it is only with the benefit of hindsight that anyone, including the DTM employees responsible for completing DTM's insurance applications, became aware that exclusion of coverage for *any* alarm-related activity might pose a problem for DTM. Notably, DTM took no action in response to Mr. Schwartz's letter inquiring whether DTM was concerned by the GL Policy's alarm exclusion. *See* ECF No. 67 at 80–81, 104, 115.

Nor does Plaintiff's reliance on an expert affect the Court's conclusion. Although Plaintiff's expert opined as to the ultimate issue that Defendants breached a duty of care in this case, he, too, acknowledged that the duty to explain changes in a renewal policy arises upon a *significant* change in the policy. ECF No. 72-11 at 3. And, as the Court just explained, at the time Mr. Schwartz procured DTM's insurance policies, he had no way of knowing that the change was significant; to the contrary, he had specific reasons to believe it was not. Imposing a duty of omniscience upon Defendants in a case such as this, only because in hindsight their failure to act caused a particular problem, would not further the policy goals of the tort system. *See Coates v. S. Md. Elec. Co-op., Inc.*, 731 A.2d 931, 936 (Md. 1999) ("[T]he determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." (citation omitted)). Thus, Defendants owed no duty to DTM either to procure coverage for alarm monitoring or to explain the import of the addition of the word "monitoring" to the Umbrella Policy's alarm exclusion, and Defendants are therefore entitled to summary judgment in their favor.

## B. Whether Defendants' Conduct Was the Cause of Any Loss to DTM

Although the Court's preceding conclusion is alone reason to grant Defendants' Motion, Plaintiff's claim suffers another fatal flaw with respect to proof of causation. Defendants seek summary judgment on the additional ground that Plaintiff cannot prove that Defendants proximately caused any loss to DTM. *See* ECF No. 67 at 26. In this regard, Defendants raise three distinct arguments: (1) that there is no evidence that DTM would have acted differently even if it was advised of the change to the alarm exclusion in the Umbrella Policy; (2) that the Umbrella Policy did, as a matter of law, cover the DOD claim and that DTM acted improperly by not challenging Arch's denial of coverage; and (3) that DTM did not need the Umbrella Policy to cover the incident because the DOD claim was settled for half of the GL Policy limit, and, accordingly, Plaintiff cannot blame DTM's decision to enter bankruptcy on Defendants. *Id.* at 26–38. The Court need not discuss each of these arguments, however, because the final point is most compelling and, as will be discussed, provides an independent reason for granting summary judgment.

In the Complaint, Plaintiff alleges that, without coverage under the Umbrella Policy for DOD's claim, DTM was left "underinsured and faced with the prospect of its largest customer and source of business offsetting the costs of replacing damaged computer equipment (totaling more than \$3.6 million) against future payments due under the security guard contract." ECF No. 3 at ¶ 30. This purportedly left DTM "insolvent and [with] little reason to continue to operate its business." *Id.* Defendants argue that there is no evidence in the record that DOD actually did withhold any payments to DTM to offset its claim for the Fort Washington incident, and, accordingly, that there is nothing to causally connect the denial of coverage under the Umbrella Policy with DTM's decision to enter Chapter 7 bankruptcy. ECF No. 67 at 37; *see also* ECF No.

16

76 at 13–14. In response, Plaintiff contends that DOD did in fact withhold contractually owed payments to DTM and that, because the contract with DOD was DTM's primary source of revenue, when DTM was left without that revenue, it lacked the wherewithal to seek protection under Chapter 11 of the Bankruptcy Code and its only option was to file for bankruptcy under Chapter 7 and completely dispose of its assets.[9] ECF No. 72 at 16–19. In support of this argument, Plaintiff cites to various portions of the record, including statements by Ms. Briggs and Mr. Briggs indicating that DOD was "getting ready to" withhold money under its contract with DTM. *Id.* at 18.

To survive summary judgment, a plaintiff must introduce specific factual evidence to support his theory of causation; he may not rely on mere speculation. *Frostbutter v. Bob Evans Farms, Inc.*, No. CIV.A. CBD-12-2388, 2013 WL 4026985, at *7 (D. Md. Aug. 6, 2013). The evidence must amount to a "probability, not just a possibility," that the defendant's negligence caused the plaintiff's injuries. *Miskin v. Baxter Healthcare Corp.*, 107 F.Supp.2d 669, 671–72 (D.Md.1999), *aff'd*, 213 F.3d 632 (4th Cir. 2000); *see also Wilhelm v. State Traffic Safety Comm'n*, 185 A.2d 715, 721 n.1 (Md. 1962) ("[T]he test of the sufficiency of the evidence to take the question of causal relationship to the jury is reasonable probability. . . ." (internal quotation marks omitted)); *Benedick v. Potts*, 40 A. 1067, 1068 (Md. 1898) ("As an injury may occur from causes other than the negligence of the party sued, it is obvious that, before a liability on account of that injury can be fastened upon a particular individual, . . . there must be evidence legally tending to show, that he is responsible for it; that is, that he has been guilty of the negligence that produced or occasioned the injury. In no instance can the bare fact that an injury

---

[9] In a Chapter 11 bankruptcy, the debtor may continue to operate, rather than liquidate its assets. *See In re WWG Indus., Inc.*, 772 F.2d 810, 812 (11th Cir. 1985) (citing 11 U.S.C. § 1108 (1982)). But in order to qualify for Chapter 11 bankruptcy, the debtor must be able to discharge certain responsibilities, including payment of administrative fees. If a debtor cannot qualify for Chapter 11 protection, the estate is liquidated pursuant to Chapter 7. *See Lakefront Inv'rs LLC v. Clarkson*, 484 B.R. 72, 77 (D. Md. 2012), *aff'd sub nom., Lakefront Inv'rs, LLC v. Sydnor*, 520 F. App'x 221 (4th Cir. 2013).

has happened—of itself, and divorced from all the surrounding circumstances—justify the inference that the injury was caused by negligence.").

The most obvious source of any loss that might have been caused by Defendants failure to procure alarm monitoring coverage for DTM would have been if DTM had to pay DOD's claim out-of-pocket if the claim exceeded DTM's GL Policy limits. That is not the case, of course, because Plaintiff, on behalf of DTM, ultimately settled the DOD claim for $500,000— half of the GL Policy limit. *See* ECF No. 67 at 246. Rather, Plaintiff's causation argument is more nuanced. He contends that Defendants' failure to procure alarm monitoring coverage under the Umbrella policy left DTM woefully underinsured, which in turn caused DTM to be unable to immediately dispose of DOD's claim against it, which in turn led DOD to threaten to withhold payments under its contract with DTM to offset its claim, which in turn left DTM with no solution other than to seek Chapter 7 bankruptcy and liquidate its assets. *See* ECF No. 72 at 16– 19. This theory of causation, however, asks a fact-finder to stack one inference upon another, with little evidentiary support for each link in the chain of causation, to conclude that Defendants' breach of any duty was the ultimate cause of DTM's decision to declare Chapter 7 bankruptcy, rather than seek protection under Chapter 11 of the Bankruptcy Code. *See id.* While this level of attenuation may alone be reason to conclude that Plaintiff cannot prove the element of causation, *see Wolf v. Fauquier Cty. Bd. of Supervisors*, 555 F.3d 311, 321 (4th Cir. 2009) (affirming dismissal of negligence action where causal link between alleged negligence and any harm was too attenuated), Plaintiff's argument suffers from a more rudimentary defect, namely, his failure to present sufficient evidence supporting multiple links in this chain of causation.

First, Plaintiff has failed to present sufficient evidence that could lead a trier of fact to conclude that DOD did, in fact, withhold any payments to DTM as a result of the Fort

18

Washington claim. In support of his statement that DOD withheld payments, Plaintiff cites statements made by Ms. Briggs and Mr. Briggs indicating that DOD was "getting ready to" withhold money from its contract with DTM, or that DOD "insinuated they had the capacity" to do so. *See* ECF No. 72-4 at 11; ECF No. 72-3 at 8. This testimony, of course, does not support the conclusion that DOD ever did withhold payments, and, in fact, both Ms. Briggs and Mr. Briggs stated that they did not know whether DOD ever withheld any payments. ECF No. 72-4 at 15; ECF No. 72-3 at 8.[10] Plaintiff also cites statements wherein Ms. Briggs and Mr. Briggs indicated that "at the end [DOD] didn't pay," and that DTM had "invoices that were out, and [DTM has] yet to find out who received the money for those contracts." ECF No. 72-4 at 13; ECF No. 72-3 at 8. But this testimony does not indicate *why* DOD did not pay "at the end"— whether it was because of the Fort Washington incident, or as a result of other equitable adjustments and liquidated damages owed by DTM, *see* ECF No. 72-4 at 12, or for any other unspecified reason.[11] Plaintiff's theory of causation hinges on a trier of fact concluding that DOD withheld contractual payments as a result of the Fort Washington incident, but Plaintiff has failed to present any admissible evidence that would lead a fact-finder to that conclusion. Without proof of this central link in the chain of causation, Plaintiff's claim must fail.

---

[10] Plaintiff also relies on an August 22, 2011 letter written by Mr. Briggs in which he stated that DTM was faced with a large lawsuit "in the amount of $4.8 million" filed by the Government as a result of "the negligence of [a DTM] employee that did not follow the proper procedure on one of the Government sites." ECF No. 72-15. The letter further states that "DTM was told that this matter must be settled by paying the claim or taking the money from the contract." *Id.* Defendants object to Plaintiff's reliance on this letter on the ground that it is inadmissible hearsay and that it, too, does not establish that DOD actually withheld contract payments as a setoff for damages from the Fort Washington claim. ECF No. 76 at 9 n.3. The Court sustains Defendants' objection. Even though the letter does not affirmatively establish that DOD withheld any payments, if introduced at trial, the statement that "DTM was told that this matter must be settled by paying the claim or taking the money from the contract," would be offered to prove the truth of the matter asserted, and, accordingly, would have to be excluded as inadmissible hearsay.

[11] For the same reason, the Court is unpersuaded by Plaintiff's reliance on a clause in the settlement agreement between DOD and DTM indicating that "DOD receivables are subject to certain defenses." *See* ECF No. 67 at 239.

19

Second, Plaintiff has adduced no evidence respecting why DTM chose one form of bankruptcy protection over another, or whether DTM would have been able to file for Chapter 11 bankruptcy under different circumstances. Plaintiff only cites certain legal authority indicating when Chapter 11 versus Chapter 7 bankruptcy may be pursued; he has cited no evidence supporting the notion that DTM was ineligible for Chapter 11 bankruptcy, nor has he cited any testimony from any DTM employee of officer relating to the decision to pursue Chapter 7 bankruptcy. *See* ECF No. 72 at 17–18.

"A requirement of proximate cause . . . serves . . . to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *See Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014). Here, even if we were to assume that Defendants breached a duty to DTM, no reasonable jury could conclude that it was a foreseeable consequence of such a breach that DTM would later be unable to file Chapter 11 bankruptcy and would have to enter Chapter 7 bankruptcy. And even if such a result were deemed to be foreseeable, no reasonable jury could conclude that Defendant's breach of any duty caused this loss where there is no evidence that DOD actually withheld any payments to DTM and there is no evidence supporting the theory that DTM was somehow ineligible for Chapter 11 bankruptcy. Because Plaintiff's theory of causation lacks evidentiary support, summary judgment is proper.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.

Plaintiff's Complaint is therefore dismissed with prejudice. Defendants' Appeal of Magistrate

Judge Decision, ECF No. 71, is therefore **DENIED** as moot. A separate Order follows.


Dated: December 8 , 2015

GEORGE J. HAZEL
United States District Judge

21